ROBERT GARRETT, *et al.*, *vs.* HENRY MAY, *et al.*

The Cent. Ohio R. R. Co. issued certain bonds, styled *"income bonds,"*
wherein it was recited, that, "for the punctual payment of the interest
and principal of said obligations, and of others of like tenor, issued or to
be issued, *in preference to the payment of dividends on the capital stock of
said company, the income arising from the road and its appurtenances, is here-
by specifically pledged;"* and afterwards, on the 1st of March 1855, the
said R. R. Co. executed a mortgage upon the whole line of said Railroad, in
trust, to secure the payment of other bonds, issued and to be issued, with
interest, to the amount of $950,000. A bill was filed by certain of the
holders of said "income bonds," praying for an injunction to restrain the
sale of said "mortgage bonds," and claiming a priority over, and an equi-
table lien upon, said "mortgage bonds" in the hands of their holders. An-
swers were filed by the defendants, responsive to and denying the material
allegations of the bill. There was no competent and admissible evidence
tending to show that any of the complainants were induced to purchase the
"income bonds" under any other representations than those on the face of
said bonds, or that the R. R. Co. had authorized any one to make such
representations. On said bill and answers, and state of the evidence,
HELD:

1st. That fraud against the "income bond-holders" is not to be imputed to
the said R. R. Co., in consequence of the issuing of said "mortgage
bonds," and that said mortgage indicates none other than a legitimate pur-
pose to resort to such means as would promote the ultimate purpose for
which the company was created.

2nd. That under the said bill, answers and evidence, the injunction should
not have been made perpetual in the Court below.

3rd. That the terms of the "income bonds" are specific, and the holders of
said bonds must be confined to the preference thereby given.

23    v.19

APPEAL from the Equity Side of the Superior Court of Baltimore city.

This is an appeal from a decree of the Superior Court of Baltimore city, sitting as a Court of Equity, passed on the 12th day of April 1858, making perpetual an injunction theretofore granted in the case. The bill of complaint filed on the 29th of February 1856, by the appellees against the appellants, was a creditor's bill, as well as a bill for an injunction; its allegations are fully stated in the opinion of this Court. Upon this bill the Court below (LEE, J.) granted an injunction, without requiring a bond, but the defendants, R. Garrett & Sons, shewing by petition that the writ prevented their disposing of a large amount of the "third mortgage bonds," the said Court afterwards required a bond to be given.

The answer of the Garretts, filed the 4th of April 1856, states as follows: That they never held themselves out, nor assumed to act, nor were authorized to act, as general agents of the Central Ohio Rail Road Company, but in the fall of 1853, consented to act for it in negotiating and disposing of certain of its bonds or obligations, and from that time have continued to act for it in the disposition, from time to time, of such obligations as it might entrust to them for that purpose, and negotiating loans on its account, and making advances of money and credit to it, or for its use, upon securities. That among the obligations entrusted to it by the company, for sale or hypothecation, were certain of its "income bonds," a class of securities well known in the stock markets, and deriving their name from the pledge of the income of the road set out upon their face as the security and the only security offered for their payment over and above the general liability of the company. That the Central Ohio Rail Road Company, in all the "income bonds" issued by it, (except one for $1,000,) including those of the complainant, May, by an agreement endorsed

Garrett, *et al.*, *vs.* May, *et al.*

thereon, and signed by its president, gave to the holders of the "income bonds" the right to convert them into stock at par. That in the disposition of said "income bonds," though they often had a discretion as to price, they were never authorized by the Central Ohio Rail Road Company to make any agreement by which the company was to be liable to the purchaser thereof in any other manner or to any other effect than as apparent on the "income bond," and that they never assumed, in any case of sale or hypothecation of any of the "income bonds" of said company, to make such sale or hypothecation upon any agreement, express or implied, with the purchaser or holder, or any one for their account, which gave or was meant to give such purchaser or holder any right or title against the company, other than what was embodied in and apparent on the bond itself. That nobody who purchased "income bonds," but the complainants, have ever set up a claim that they were negotiated with an agreement for other rights than those given by the bond, and that such claim, on their part, was made only a few days before the filing of the bill. That in regard to the "income bonds" held by the complainant, May, they deny, in terms, that they or either of them made to him or to his agent, Oelrichs, or to any one for either of them, the declarations, representations or affirmations charged in the bill. That a third mortgage was executed by the Central Ohio Rail Road Company, with their privity, and openly to Messrs. Swann, Hopkins and Lurman, (the latter being a partner of the aforementioned Henry Oelrichs,) dated 1st, and acknowledged 5th March 1855, and recorded in Ohio, where all the property lay that was covered by it, and that the mortgagees (Swann, &c.) put their certificates on $295,000 of the "third mortgage bonds," in April 1855, and on the remainder in June following, in which last month and year the bonds were brought to the notice of

the community, in Baltimore, where they were regularly printed in the brokers' books, as early as September 1855. That the whole amount of the "third mortgage bonds" (after deducting $100,000, provided for a sinking fund) was $850,000, of which amount they hold $798,000, received at the times above stated, when the company was not insolvent, according to their then or present belief, as they advanced in cash for it, between 1st May 1855, and 1st February 1856, $170,487.18, principally for payment of interest on mortgage and "income bonds," and forbore to sell the securities they held, as they might have done at any time, for their reimbursement. That the said $798,000 of "third mortgage bonds" are now held by them for sale, without limit, on account of the Central Ohio Rail Road Company, and they are entitled, out of the first sales, to be reimbursed $143,750, being a portion of their advances in 1855, and, of the further sales, the proceeds are to be divided, and 65 per cent. goes to the residue of the debt due them, and 35 per cent. to the satisfaction of certain notes of the company, endorsed by sundry of its directors for its accommodation, and discounted for its use, and that when the bill was filed in this cause, the sum of $24,366.50 was due them, by average, 12th September 1855, and the further sum of $374,892.92 on the 5th February 1856, and that when the bill was filed, they had full power to sell said mortgage bonds for their debt, and that besides said mortgage bonds, they hold as security $157,500 of "income bonds," the interest coupons on the first and second mortgages taken up by them, and a mortgage executed to them without any request on their part, though accepted by them, bearing date 28th September 1855, and also held an order for $6,893.75 of mail pay on the Postmaster General, which has since been received, and is the only payment made them. That they deny that the "third mortgage bonds" or third mortgage security are liable to the "in-

come bond-holders," or that such holders have any equitable lien, or grounds for an equitable lien on them. That they took the "third mortgage bonds" without knowledge or notice of any claims thereon of any holders of "income bonds," and deny all knowledge or notice of the representations as to further security for "income bonds" charged in the bill to have been made by the company or themselves, and each of the respondents denies having made such representations, or any thing to the like effect in regard to "income bonds." That the holders of "income bonds" are not entitled to priority over the third mortgage as against them, or entitled in any way to the benefit of the third mortgage. That they know of no such law in Ohio as is mentioned in the bill making "income bond-holders" legal mortgagees of the company's property and income, and that the allegation thereof is at variance with the rest of the bill, and destructive of its equity. That they never have cast any cloud on, or impaired the rights of "income bond-holders," or set up any claim in conflict with their rights. The answer then pleads the statute of frauds, the want of jurisdiction on several specified grounds, that the complainants are not entitled to file a creditor's bill, and that they have adequate remedy at law.

The answer of the Central Ohio Rail Road Company is as follows: It protests against the exercise of jurisdiction over it, and sets up the same defences of law which are relied on in the answer of the Garretts. It adopts that answer as to the details of the sale to Oelrichs, and avers that no demand outside the bill has been made on it, by any of the complainants, for any other bonds than those which they received. It says that the Garretts were never authorized by it to enter into any agreement by which the company was to be liable to the holders of "income bonds" in any other manner than as appears on the bonds themselves, and that they have always understood from the Garretts

that they so sold them, and that it never agreed with any of the complainants, or authorized the Garretts to substitute "third mortgage bonds" for "income bonds," or make provision by "third mortgage bonds" for the convertibility or security of "income bonds." And it denies that the Garretts are or ever have been its general agents, or have ever been held out as such, and says that they were agents only to sell its bonds and negotiate loans for it, and that their only power in regard to "income bonds," was to sell them as they were, without adding to, or taking from, the obligation imported by their terms when they left the company's hands.

The complainants filed under the commission, as their evidence, four mortgages executed by the company; of these the 1st and 2nd are not connected with the issues presented on this appeal. The 3rd mortgage is dated the 1st of March 1855, and purports to secure the sum of $950,000; the 4th, dated the 28th of September 1855, is to Robert Garrett & Sons, and the amount intended to be secured, $500,000.

The original "income bond," marked C. O. No. 1, filed with the answer of the Cent. Ohio R. R. Co., and therein referred to, is as follows:

STATE OF OHIO.

No. 53.      *Central Ohio Rail Road Company.*      $1,000.

The Central Ohio Rail Road Company acknowledge to owe R. Garrett & Sons, or bearer, the sum of one thousand dollars, which sum said Central Ohio Rail Road Company promise to pay to the legal holder thereof, at the office of the Ohio Life Insurance and Trust Company, in the city of New York, on the first day of April, in the year 1860, and also interest thereon, at the rate of seven per centum per annum, semi-annually, on the first day of each April and October ensuing the date hereof, until said principal shall be paid, upon presentation at said office of the proper an-

nexed interest warrant.   For the punctual payment of the interest and principal of this obligation, and others of like tenor, issued or to be issued, in preference to the payment of the dividends on the capital stock of said Central Ohio Rail Road Company, the income arising from their road, and its appurtenances, is hereby specifically pledged.   And the said company further agree, that this obligation, and all rights and benefits arising therefrom, may be transferred, by general or special endorsement, or by delivery, as if the same were a note of hand.

In testimony whereof, the said Central Ohio Rail Road Company have hereunto caused to be affixed their corporate seal, and these presents to be subscribed by their president, and countersigned by their secretary, at the city of Zanesville, on the first day of February in the year 1855.

J. H. SULLIVAN, President.

*Wm. Wing,* Secretary.

Written upon its face:—"One thousand dollars.   Redeemable April 1st, 1860."

Upon the back of said bond was the following agreement:

By virtue of a resolution of the board of directors of the Central Ohio Rail Road Company, authorizing it to be done, it is agreed that the holder of the within bond may exchange the same for twenty shares of the capital stock of said company, at any time before the maturity of said bond, by presenting the same, together with the unpaid interest warrant, at the office of the treasurer of said company, in the city of Zanesville.

In witness whereof, I, John H. Sullivan, the president of said company, have hereunto affixed my official signature.                      J. H. SULLIVAN, President.

All other evidence in the cause sufficiently appears from the arguments of counsel, and the opinion of this Court. The Court below, (LEE, J.,) on the 12th of April 1858, de-

creed that the "income bonds" held by May and others, were a security prior to the "third mortgage bonds," and perpetually enjoined the defendants from disposing of any of the "third mortgage bonds." From this decree the defendants have prosecuted the present appeal.

The cause was argued before BARTOL, GOLDSBOROUGH and COCHRAN, J.

*J. M. Campbell,* for the appellants:

The Courts of Maryland have no jurisdiction to determine the relative priorities of securities affecting landed estate in Ohio. *Sto. Conflict of Laws, secs.* 539, 543, 545, 551, 552, 363, 364 and 365. The Courts of Maryland have no jurisdiction of a creditor's bill, where the debtor resides and all his property lies out of the State. (See authorities above cited.) The question of priority arises only upon distribution, and it cannot be settled hypothetically before the distribution comes.

Putting aside the extra-territorial difficulty, the statute of frauds is a bar to the attempt, directly or indirectly, to get by parol an interest in land, as security. A party has lent money, and now asks, that by *parol,* an agreement giving an interest in land may be enforced. This cannot be done. The same statute is a bar to the attempt to interpolate into the "income bond" a provision not contained in it, being the varying of a written instrument by parol.

If the alleged representations were made, there was adequate remedy at law for non-compliance with them. On such a contract, a suit at law would lie. The measure of damages would be the difference between the actual value of the "income bonds" and the "third mortgage bonds."

There is absolutely no proof that the Cent. Ohio R. R. Co. ever authorized the sale of any "income bonds" except

according to their own written terms, and those terms, on their face, indicate what was to be their only priority, viz., to dividends on stock, and that they were not meant to be, and are not either legally or equitably a mortgage. *Perkins vs. Debtford Pier Co.*, 13 *Simons*, 281. No proof is offered of any representations made by Garrett to any of the "income bond-holders" now suing, except in regard to May, and as to him, the only proof is that May said John Garrett made representations to him. This was excepted to, and amounts to nothing.

*H. May* and *R. J. Brent* for the appellees:

I. The "income bonds" held by the complainants, constitute, as between the rail road company and the holders, an equitable lien upon the whole income or revenues of the rail road. An idea has been entertained that the expression in these bonds, "in preference to the payment of dividends on capital stock," &c., makes them nothing but a preferred stock. Such an idea would destroy the "income bond" as an evidence of debt, and enable the debtor to deprive the creditor of his stipulated security, by creating new debts *ad infinitum*, to be preferred to that very security which the senior class of creditors had solemnly been promised. The proposition on the other side, is simply this, that the debt clearly evidenced by the obligatory part of the bonds held by the complainants, is virtually without any security whatever, notwithstanding these bonds specifically pledge for that debt *all the income of the road and its appurtenances*. Undoubtedly the charter of this company never authorized such an idea, as paying creditors with preferred dividends on stock, when, by its 12th section, it declares that dividends shall be made among the stockholders.

The appellants construe this contract erroneously. 1st. Because the contract should be supported, and not defeated,

*ut res magis valeat quam pereat.* 2 *Parsons Con.,* 15. *Broom's Maxims,* 353. 2nd. Because, in cases where the contract bears a double construction, it should receive that sense which will make it efficacious. 2 *Parsons Con.,* 16. 3rd. Because such a construction should be placed on it as will make it just and reasonable. 2 *Parsons Con.,* 16. 4th. Because their construction regards only the clause which provides a preference over stockholders, and ignores the clause which specifically pledges the whole income for a debt. 2 *Parsons Con.,* 17. How, then, should the clauses of this bond be reconciled so as to give effect to the whole context? It will be observed that the whole income is pledged to meet the principal and interest as they fall due; and the exclusion of dividends to stockholders until these bonds are paid, looks to an accumulation of the income, so as to prevent dividends being paid to stockholders at any time before the maturity of the bonds.

In equity, parties can always contract for a lien on future earnings or property to be acquired, and such liens will be enforced. *Redfield on Railways,* 587, 591. 3 *Leading Cases in Eq.,* 307, 308. It will be seen that the charter of this company expressly authorized the issuing of "income bonds." (See 21 *How.,* 422, 424.) And this power exists unless restrained by the charter. *Redfield on Railways,* 575. *Susquehanna Bridge and Bank Co. vs. Gen. Ins. Co.,* 3 *Md. Rep.,* 311. But we insist that such a pledge of all the income or revenues of the road, amounts, in equity, to a pledge of the road itself, creating therefore an equitable mortgage on the road, its franchises and revenues. *Redfield on Railways,* 587. *Pierce on Railways,* 512. *Casilly & Wife, et al., vs. Meyer, et al.,* 4 *Md. Rep.,* 10, 11. *Sullivan, et al., vs. Tuck, Ex'r of Bowie,* 1 *Md. Ch. Dec.,* 59. *Legard vs. Hodges,* 3 *Bro. Ch. Rep.,* 536. Same case in 4 *Bro. Ch. Rep.,* 422. 2 *Story's Eq.,* sec. 1231.

It follows, therefore, from the nature and effect of these

"income bonds," that the Railroad Company could not, without a violation of their own obligations, tantamount to fraud, attempt to impair the unrecorded lien on their property, as based on the "income bonds," by placing on record a third mortgage deed, designed to secure a new batch of bonds to be circulated in the community upon the faith that these "third mortgage bonds" were to be paid, in order, after the "first and second mortgage bonds," as secured by the effect of the recorded mortgages. Such an attempt to overreach their antecedent creditors who held these "income bonds," by the creation of junior but preferred liabilities, is, in itself, a fraud on the part of the company, which merits the sternest treatment at the hands of a Court of Equity. The company, as the maker of these "income bonds," having express notice of their equitable lien on its whole corporate property, ought to be restrained by injunction from the execution of its designs, thus to overreach the elder but unrecorded lien created by its "income bonds," because, unless restrained, the *bona fide* purchasers of the "third mortgage bonds," without notice of these unrecorded liens, would be preferred; and thus irreparable injury would be inflicted on the confiding purchasers of the income bonds. These are familiar principles of equity. 2 *Waterm. Eden on Inj.*, 341, *and notes. Ibid.*, 387, *note* 1. *Clagett, et al., vs. Salmon,* 5 *G. & J.*, 334, 348, 349. The Railroad Company being here a party defendant, is clearly liable to the terms of the decree under review, notwithstanding its non-residence, or the locality of its property. 2 *Sto. Eq.,* secs. 1292 and 1298. *Penn vs. Lord Baltimore,* 1 *Ves., Sr.*, 454. *Carroll vs. Lee,* 3 *G. & J.*, 504. *White vs. White,* 7 *G. & J.*, 208. *Massie vs. Watts,* 6 *Cr.*, 148. *Nor. Ind. R. R. Co., vs. Mich. Cent. R. R. Co.*, 15 *How.*, 243.

II. The firm of R. Garrett & Sons are co-defendants, and the question is, whether *quoad* the "third mortgage bonds"

held by them, they are not equally affected in good conscience by the superior equities of the holders of the "income bonds." It appears, not only from the evidence in the case, but from the answer of the Garretts, that they received the "income bonds" from the company, as its financial agents, and put them in circulation through the community. Therefore they had express notice of the equities created by these bonds. It also appears from the evidence, and the answer of the Garretts, that they received and held, at the date of this injunction, a very large amount of the "third mortgage bonds," and that these bonds were placed in their hands by the Railroad Company. Their own answer admits that they were privy to the preparation and execution of the third mortgage and its bonds, and the same fact is abundantly proved by the evidence in the cause. We therefore confidently maintain, that the Garretts are in no better predicament than the Railroad Company, whose financial agents they were, but they took the "third mortgage bonds" not only for the improper uses of the company and themselves, but with express notice of our prior equities, and of the necessary repugnancy between those known equities and the "third mortgage bonds" they designed using to our detriment. Such notice fastened on the Garretts, makes them trustees of the title derived by the "third mortgage bonds," for the benefit of the "income bonds." 1 *Story's Eq.*, secs. 395, 399. *Hudson vs. Warner & Vance*, 2 *H. & G.*, 415.

III. The representations of John Garrett, made to different parties at the time of issuing the "income bonds," are proved to have been expressly to the effect that the "income bonds" would be retired or absorbed by the "third mortgage bonds," as soon as they should be prepared and issued. These declarations, though not proved to have been made to any of the complainants at the time of acquiring their "income bonds," except in the case of J. Lee & Co., are

nevertheless admissible, in the peculiar circumstances of this case: 1st. Because similar representations to those alleged by a plaintiff to have been made by the defendant, are always received to show the intent of a party, or the "mala mens." 1 *Phillips Ev*, (*Cow., Hill & Edw.,*) 768. 2nd. Because there can be an indirect representation to the complainants from the publicity of the defendant's, John Garrett's, statements to the witness, in regard to the provisions made for the "income bonds," which his firm was circulating in the community, and virtually advertising for sale. 10 *B. & C.*, 140, 141. *Glassford Ev.*, 334, 335. 2 *Smith's Lead. Cases*, 642, 643. *Maltby vs. Chistie*, 1 *Esp. Rep.*, 342. 3rd. Because the conduct of the defendant, John Garrett, in making these representations of the intended convertibility of the "income bonds" into "third mortgage bonds," ought, in equity, to estop him and his firm from denying the truth of these representations, *quoad* the "third mortgage bonds" held by them. 1 *Spence's Eq.*, 550. *Pickard vs. Sears, et al.*, 6 *Adol. & Ellis*, 469. 4th. Because a material representation, not known to be true, is equivalent to a fraudulent representation. *Morns vs. Heyworth*, 10 *Mees. & Wels.*, 155. *Lindenan vs. Desborough*, 8 *Barn & Cress.*, 586. *Huguenin vs. Rayley*, 6 *Taunt.*, 186. *East vs. Matheny*, 1 *A. K. Marsh.*, 192. 5th. Because the conduct of agents, in making representations to circulate the "income bonds," is, in law, the conduct of the principal. 1 *Parsons Con.*, 62, *notes*. 2 *Parsons Con.*, 277. 6th. Because May's declaration, as proved by Oelrichs, that he would buy on the faith of the alleged representations made by John Garrett to him, is part of the *res gesta*, and otherwise competent, especially as Oelrichs was agent of the Garretts in selling to May, and he did not undeceive him. 1 *Moody & Malken*, 306, 307, 308. 2 *Eng. C. L. Rep*. 7th. Because John Garrett subse-

quently admitted the fact of his having made such representations to the witness, Oelrichs.

IV. What relief are the complainants entitled to? We have the right to a supplemental decree, requiring the Garretts to hold the bonds now in their hands as a security for the benefit of these complainants, thus giving them nearly two dollars of "third mortgage bonds," as security for one of "income bonds," and so the decree may be modified in any way by this Court. 1 Vol. of Code, Art. 5, sec. 28. Or a receiver may be appointed to hold the $190,000 of "third mortgage bonds" for the security of these complainants. *Redfield on Railways*, 573, sec. 5. The decree appealed from, was only final so far as it settled the priority of our "income bonds," and it shows, on its face, that the Court contemplated further proceedings to carry out the decree practically.

V. We maintain that the parol evidence tending to show that the "income bonds" were agreed to be soon substituted by "third mortgage bonds," does not contradict the terms and effect of said "income bonds," but shows simply that the purchasers took them as collateral security for the due delivery of the "third mortgage bonds" then in a course of preparation for issue. Such evidence relates merely to the tenure of the "income bonds," which were delivered in part execution of this parol agreement to take them up in a short time with new securities. 10 *G. & J.*, 404. We want specific performance of this partly executed agreement, as it was the inducement held out to the public, by the Garretts, to facilitate the sale of the "income bonds;" and they ought to be held to the performance of their own promises, when the means are in their control.

Finally, we submit that this case, as against the company and their agents, the Garretts, should be ruled by the broad principles affirmed in 23 *Howard*, 397, 398, and 400.

*Reverdy Johnson,* for the appellants, in reply:

1st. The only representation charged to have have been made by the bill, as amended by the agreement, is that made to May alone. Was there, then, any representation made to May at all? The bill does not allege that any representation was made with a fraudulent design and purpose. It is consistent with the bill that the representation was made in good faith. In the absence of such an allegation, this Court cannot consider the question of fraud, even if the evidence establishes fraud. But the case need not be put on this ground, for there is, in fact, no evidence of such a representation. The sale was made on the 24th of March 1855, and the *written contract of sale* contains no such representation. In making the sale, Oelrichs is acting as May's agent, and the agent of the Garretts. There is no pretence that the Garretts said to Oelrichs any thing in regard to the bonds, at the time of the sale. He testifies that May said Garrett made the representation. This evidence is excepted to. The case in 1 *Moody & Malkin,* does not sustain the admissibility of this proof. Strike out this part of Oelrichs' testimony, and there is not a particle of proof of the representation. But there is no proof of any agency on the part of the Garretts to make any such representations. Oelrichs' only agency was to sell the "income bonds." There was, then, no representation.

2nd. A question of law, then, arises, viz. To what relief are the holders of the "income bonds" entitled? What is the nature of the bond, and what right and what security does it give? The word *income,* here, means *net income* from the road and its appurtenances. The holder is thus made only a *preferred stockholder.* The money borrowed, afterwards furnished the means for making the income; for it was applied to the construction and working of the road. It was the food on which the "income bonds" lived.

GOLDSBOROUGH, J., delivered the opinion of this Court:

On the 8th day of May 1847, the General Assembly of the State of Ohio passed an Act incorporating the Central Ohio Railroad with perpetual succession, and with authority to construct a Railroad, commencing at or near the city of Columbus, and extending eastward to such point on the Ohio river as the directors might select.

By the 14th section of said Act, the company was empowered to borrow money on its credit, and to make and execute such bonds, promissory notes and other evidences of debt, payable, transferable and redeemable at such times and places and in such form as might be therein designated. By the 15th section, it is provided, "that for the security of the payment of such monies so borrowed, and the interest thereon, said directors may pledge, by mortgage or otherwise, their entire road, franchises, fixtures and equipments, with the income and resources thereof, together with the capital stock."

In pursuance of this authority, the company proceeded to construct the Railroad; and, with a view of obtaining funds, executed a first and second mortgage, the provisions of which are not involved in this suit.

After the execution of the above mortgages, the Railroad Company issued certain bonds, denominated "income bonds." The material part of which is as follows: "For the punctual payment of the interest and principal of said obligations, and of others of like tenor, issued or to be issued, *in preference to the payment of dividends on the capital stock of said company, the income arising from the road and its appurtenances is hereby specifically pledged.*"

A portion of these bonds were entrusted to the appellants, Robert Garrett, Henry S. Garrett and John S. Garrett, for sale or hypothecation.

The appellee, Henry May, by his agent, Henry Oelrichs, purchased five of these bonds, on the 24th day of March

1855, for which he paid, through his agent, the consideration money to the appellants, the Garretts.   Josiah Lee & Co. also purchased fifty of these bonds.

The Railroad Company executed a third deed of mortgage on the first day of March 1855, in favor of the appellants, Thomas Swann, Johns Hopkins and Gustav W. Lurman, as mortgagees and trustees.   The purpose of which deed was "to provide for the funding of the floating debt, and to raise money therefor, by loan, to an amount not exceeding $850,000.

The appellees, Henry May and Josiah Lee & Co., feeling themselves aggrieved by the conduct of the Railroad Company, in executing this third mortgage, filed their bill of complaint in the Superior Court of Baltimore city, on the 29th day of February 1856, and this bill was so filed in behalf of themselves and all other creditors of the Railroad Company.   The complainants prayed for an injunction to restrain the appellants, the Garretts, from selling the bonds issued in pursuance of the power conferred by the third deed of mortgage.

By an agreement of the parties, filed on the 6th of February 1858, "the original complainants constituting the firm of Josiah Lee & Co., and all allegations relating thereto, are to be stricken out of said bill of complaint. The bill is to be considered as the bill of complaint of Henry May, Zenus Barnum, William Carstangan, Daniel W. Warneken, Edward Boninger and Robert Leter, the last two trading as Boninger Brothers."

The grounds on which relief is sought, are, that the five "income bonds" of the appellee, May, were bought by him from the appellants, the Garretts, who had been for a long time previously the *agents* of the Railroad Company, and, as agents, entrusted with the custody and disposal of these "income bonds," and of others of like tenor and effect, and with a view to better negotiation of them, the company, as

well as its agents, especially John S. Garrett, did declare
and affirm that the said "income bonds" *were to be secured*
or *provided for* by a deed of mortgage, then about to be exe-
cuted by the company, on all its property and effects, sub-
ject to two preceding mortgages; and that the manner in
which the "income bonds" were to be secured or provided
for, in the third deed of mortgage, was by converting the
"income bonds" into bonds secured by the third mortgage.
That similar representations were made to others than the
appellant, May.

That when this mortgage was executed, no provision
was made for the better securing the "income bonds," as
the company was bound to do.

That the company, being insolvent, delivered to the Gar-
retts all, or nearly all, the bonds secured by the third
mortgage, and that they then held them either as agents
of the company, to raise money thereon, or as collateral
security for, or in satisfaction and discharge of, the com-
pany's indebtedness to them or others; but that, in either
case, these "third mortgage bonds" are liable, in the hands
of the holders, to the equitable lien thereon of the com-
plainants.

That independently of any agreement for further secur-
ity in respect to the "income bonds," they were issued under
authority of a law of Ohio, and, by virtue of that law, the
holders of the "income bonds" are legal mortgagees of the
entire property and income of the company, and, as such,
entitled to priority over the holders of the "third mortgage
bonds," and that the Garretts pretend that the "third mort-
gage bonds" are entitled to priority over the "income
bonds;" and the complainants allege that such pretences
prevent the sale or disposition of their bonds at their pro-
per value.

The complainants then prayed for an injunction restrain-
ing the defendants from disposing of, or parting with, the

Garrett, *et al.*, *vs.* May, *et al.*

bonds now held by them, and secured by the third mortgage, or from setting up the said bonds as entitled to priority or preference over the "income bonds;" and that the complainants and holders of the "income bonds" may be substituted as preferred creditors, to the security of said deed of mortgage. The injunction was issued as prayed.

At the final hearing, the Superior Court passed a decree in conformity with the prayer of the complainants, and perpetuated the injunction. From this decree an appeal was prayed and taken.

In view of the opinion entertained by this Court, upon the merits of the case, as developed by the bill, exhibits, answers and depositions, we do not deem it material to decide the question of jurisdiction raised by the appellants.

Although the allegations in the complainants' bill may have justified the Court below in granting the injunction, yet, upon the coming in of the answers and depositions, we think the Court erred in passing its final decree, granting the relief prayed for, and perpetuating the injunction.

The answers of the defendants are not only responsive to the bill in every material allegation, but expressly deny the *general agency* of the Garretts, the representations of their intention to substitute the "third mortgage bonds" for the "income bonds," and especially deny that any authority was given or exercised to sell the "income bonds" upon any other terms than those appearing upon the face of them.

Looking then to the depositions, and excluding from our view the connection of Josiah Lee & Co. with the bill and subsequent proceedings, we find no testimony, whatever, tending to show that any of the present appellees were induced to purchase the "income bonds" under any other considerations than those terms stated on the face of them, except Mr. May; and we are of opinion that his declarations, made to his agent, Mr. Oelrichs, were not admissible, and were properly excepted to by the appellants.

And further, if any representations were made by the appellants, the Garretts, that the "third mortgage bonds" would be substituted for the "income bonds," there is no evidence to show that the Railroad Company gave any authority to make such representations, or, if they were made, that they came to the knowledge of Mr. May, and that he was influenced by them to make the purchase of the bonds. he now holds.

We are therefore constrained to decide that the appellees have wholly failed to establish the general agency of the appellants, the Garretts, or that they made the representations charged in the bill; and further, that no authority was vested in them to sell the "income bonds" upon any terms other than those on the face of them. That to superadd others, would have been in conflict with that well settled rule of law, that no written instrument can be explained, altered *or added to* by parol, which, in its application to this case, must be observed.

The point was especially urged, in argument, that the Railroad Company, having issued the "income bonds," had no legal right to execute the third mortgage, and, by so doing, committed a fraud upon the purchasers of the "income bonds," and deprived them of every means of deriving any pecuniary advantage from their possession. We have maturely considered the force of this point, and are of opinion that it is untenable.

We can perceive nothing in the stipulations of the "income bonds" which in any way precluded the Railroad Company from executing other obligations to obtain means to complete their road. The terms of the "income bonds" are specific, and the holders of these bonds must be confined to the preference given thereby. The procurement of funds other than those realized by the sale of the "income bonds," was but increasing the ability of the company to render the road available for the reception of income, thereby en-

abling it to meet the payment of the interest and principal of these bonds. The third mortgage indicates none other than a legitimate purpose to resort to such means as would promote the ultimate purpose for which the company was created.

*Order reversed, and bill dismissed,*

*with costs to appellants.*